RIVERSIDE SCHOOL DISTRICT

v.

CAREER TECHNOLOGY CENTER OF LACKAWANNA COUNTY, Carbondale Area School District, Dunmore School District, Forest City Regional School District, Lakeland School District, Mid Valley School District, North Pocono School District, Scranton School District, Valley View School District.

Career Technology Center of Lackawanna County, Carbondale Area School District, Dunmore School District, Forest City Regional School District, Lakeland School District, Mid Valley School District, North Pocono School District, Scranton School District, Valley View School District

v.

Riverside School District.

Appeal of: Riverside School District.

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2014.
Decided Nov. 5, 2014.

Carl J.B. Poveromo, Scranton, for appellant.

Judith G. Price, Moosic, for appellee Career Technology Center of Lackawanna County.

BEFORE: MARY HANNAH LEAVITT, Judge, PATRICIA A. McCULLOUGH, Judge, and ROCHELLE S. FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

▆ Riverside School District (Riverside) appeals from a judgment entered in favor of the Career Technology Center of Lackawanna County (CTC) and against Riverside based upon the June 21, 2013, order of the Court of Common Pleas of Lackawanna County (trial court).[1] Riverside appeals that portion of the trial court's June 21, 2013, order that: denied Riverside's request for declaratory judgment, finding that the terms of the Articles of Agreement for establishment of the Lackawanna County Area Vocational–Technical Schools (Agreement) remained in effect and that Riverside is bound by those terms; and rendered a verdict in favor of CTC for breach of contract.[2] We affirm in part and reverse in part.

CTC, an area vo-tech school, was established on December 6, 1968, through adoption of the Agreement. At the time of its inception, CTC had 17 school districts; however, prior to this litigation, due to

---

1. This case involves a declaratory judgment action, a non-jury trial, and an order issued by the trial court on June 21, 2013. Thereafter, Riverside filed its post-trial motions and the trial court entered judgment on November 22, 2013. Pursuant to *Jones v. Prudential Property and Casualty Insurance Company*, 856 A.2d 838, 840 & n. 1 (Pa.Super.2004), the trial court's June 21, 2013, order granting declaratory relief was a "judgment," and it was therefore unnecessary to enter the November 22, 2013, judgment. As in *Jones*, it was, however, necessary to file post-trial mo-tions in order to appeal. *Id.* at 840 n. 1. Because judgment had already been entered on June 21, 2013, we will refer to the June 21, 2013, order as the "judgment." *Id.* at 840 n. 1, 841 n. 2.

2. Riverside does not appeal that portion of the trial court's order that denied CTC's request for declaratory relief seeking to prohibit Riverside from allowing its students to attend an out-of-area vocational-technical (vo-tech) school.

district consolidation, nine school districts remained, including Riverside.

CTC's Joint Operating Committee (JOC), which is comprised of one member from each of the participating school districts, is the operating and governing body of CTC. CTC also has advisory committees, including an Administrative Advisory Committee, comprised of the superintendents from each of the participating school districts. In addition, CTC has an Administrative Director, Vincent Nallo, who has executive oversight of the vo-tech school.

On August 21, 2012, Riverside filed a civil complaint for declaratory judgment against CTC and all other participating school districts of CTC. The complaint alleged that Riverside is no longer obligated to participate in CTC because there are no outstanding capital expenditures and, pursuant to Article 11 of the Agreement, the Agreement is no longer in effect.

On October 12, 2012, CTC and its participating school districts filed a multi-count complaint against Riverside, claiming that the Agreement remains in effect and that Riverside violated the Agreement by failing to pay its share of the operating expenses and by unilaterally withdrawing from CTC. CTC sought a declaration that the Agreement remains in effect, that Riverside violated the terms of the Agreement, and that the Agreement precluded Riverside from sending its students to other vo-tech schools.

The trial court consolidated the two actions on November 15, 2012, and on March 27, 2013, held a non jury trial.

The parties agreed that the termination of the Agreement is controlled by the language of Article 11, which states:

> 11. *EFFECTIVE DATE AND TERM*
>
> This agreement shall become effective *December 9, 1968* and *shall remain in effect until* all obligations for financing the construction, remodeling or alteration of the area vocational-technical schools, and all obligations created in connection therewith or in the financing of any *subsequent capital expenditures shall have been paid in full.*

(Agrmt., Article 11 at 3 (Italicization added).)

Before the trial court, CTC argued that Riverside has outstanding financial obligations in the form of capital expenditures, including a Master Equipment Lease–Purchase Agreement (Master Lease) that was executed on December 19, 2011, between CTC and PNC Equipment Financing, LLC.[3] Riverside approved the Master Lease, which provided the necessary financing for CTC's purchase of a Heidelberg cutter and a Presstek printing press to be used as part of CTC's instructional curriculum. The Master Lease provides for monthly payments of principal and interest from January 28, 2012, through December 28, 2021.

CTC's former Chief Financial Officer, Michael Sporer, described the Master Lease as a capital lease, which denotes

---

3. CTC also argued that Riverside had the following outstanding financial obligations in the form of capital expenditures: (1) a $20,000,000 capital building project that was initiated in 2009; (2) a $2,000,000 capital building project that was initiated in 2011; (3) a $17,200,000 capital building project that was initiated in 2012; and (4) Riverside's share of CTC's proposed budget for the 2012–13 school year. The trial court determined that the 2009 project was cancelled before any financial obligations were incurred and that the 2011 project was completed before, and the 2012 project was entered into after, Riverside's withdrawal from CTC. Further, the trial court determined that Riverside's approval of the 2012–13 budget was not a capital expenditure. None of these determinations have been contested and, therefore, will not be addressed.

that at the end of the lease term and upon satisfaction of the terms of the agreement, the equipment becomes the property of the lessee, CTC. Sporer also testified that the Master Lease is reflected as a long-term debt on CTC's financial statements.

The trial court determined that the Master Lease constitutes a financial obligation for a capital expenditure, and, thus, the Agreement remains in effect. The trial court further found that because the Agreement is still in effect, Riverside has breached the Agreement by unilaterally withdrawing from CTC and by failing to pay its respective share of the operating expenses for the 2012–13 school year.

The trial court ultimately denied Riverside's request for relief and granted in part and denied in part CTC's requests for relief. Riverside appealed to this court.[4]

Initially, Riverside contends that the trial court erred in holding that the Master Lease qualifies as a financial obligation for a capital expenditure and that the Agreement therefore remains in effect. We agree.

■■■ A contract's interpretation is a question of law for this court. *Profit Wize Marketing v. Wiest*, 812 A.2d 1270, 1274 (Pa.Super.2002). The general mandates of contract interpretation are: "(1) that no provision of a contract should be treated as surplusage or redundant if any reasonable meaning consistent with other parts of the agreement can be given to it[,]" and "(2) that the court must determine the intent of the parties and give effect to all provisions of the contract." *Wyoming Valley West School District v. Northwest School District*, 695 A.2d 949, 953 (Pa.Cmwlth.1997).

Riverside argues that the language in Article 11 of the Agreement is plain and unambiguous and that the Agreement ends when there are no outstanding financial obligations for capital expenditures. Riverside asserts that the Master Lease is not a capital expenditure.

The Master Lease is a $400,000 equipment lease for a printing press and cutter. The Master Lease states in pertinent part that:

**4.3. Lessor and Lessee understand and intend that the obligation of Lessee to pay Rent Payments under each Lease shall constitute a current expense of Lessee and shall not in any way be construed to be a debt of Lessee in contravention of any applicable constitutional or statutory limitations or requirements concerning the creation of indebtedness by Lessee, nor shall anything contained in any Lease constitute a pledge of the full faith and credit or taxing power of Lessee.**

(Master Lease, Section 4.3, at 2 (emphasis in original).) Further, section 6 of the Master Lease provides for termination upon a non-appropriation event as follows:

6.1. For each Lease, Lessee represents and warrants that (a) it has appropriated and budgeted Legally Available Funds to make all Rent Payments required pursuant to such Lease for the remainder of the fiscal year in which the Lease Term commences; (b) it currently intends to make Rent Payments for the full Lease Term as scheduled on the applicable Payment Schedule so long as funds are appropriated for each succeeding fiscal year by its governing body; and (c) during the 10 fiscal years prior to the date of the applicable Lease, its

**4.** Our review "is limited to determining whether the trial court's findings of fact are supported by substantial evidence, whether an error of law was committed, or whether

the trial court abused its discretion." *Associated Pennsylvania Constructors v. City of Pittsburgh*, 134 Pa.Cmwlth. 536, 579 A.2d 461, 463 n. 5 (1990).

governing body has not failed (for whatever reason) to appropriate amounts sufficient to pay its obligations that are subject to annual appropriation. Lessee reasonably believes that moneys in an amount sufficient to make all Rent Payments can and will lawfully be appropriated and made available therefor.

6.2. If Lessee's governing body fails to appropriate sufficient funds in any fiscal year for Rent Payments and other amounts to be paid under a Lease in the next succeeding fiscal year, then a *"Non–Appropriation Event"* shall have occurred. If a Non–Appropriation Event occurs, then: (a) Lessee shall give Lessor written notice at least 30 days prior to the end of the then current fiscal year of such Non–Appropriation Event and provide written evidence of such failure by Lessee's governing body; (b) on the Return Date, Lessee shall return to Lessor all, but not less than all, of the equipment covered by the affected Lease, at Lessee's sole expense, in accordance with Section 21 hereof; and (c) the affected Lease shall terminate on the Return Date without penalty or expense to Lessee, *provided,* that Lessee shall pay all Rent Payments and other amounts payable under the affected Lease for which funds shall have been appropriated, and *provided further,* that Lessee shall pay month-to-month rent at the rate set forth in the affected Lease for each month or part thereof that Lessee fails to return the Equip-

ment under this Section 6.2. *"Return Date "* means the last day of the fiscal year for which appropriations were made for the Rent Payments due under a Lease.

(Master Lease, Sections 6.1 and 6.2, at 3 (emphasis in original).)

██ Funds that are subject to a non-appropriation clause[5] are not considered "debt" within the meaning of debt limitations. *See* Charles W. Goldner, Jr., *State and Local Government Fiscal Responsibility: An Integrated Approach,* 26 Wake Forest L.Rev. 925, 942 (1991) ("Judicial interpretation of the constitutional and statutory debt limitations has resulted in holdings ... that lease purchase financing with a nonappropriation clause does not create debt under the debt limitations") (footnotes omitted).[6]

██ By its terms, the Master Lease construes the rental payments as operating expenses for the leased equipment and not as payments on a promise to pay a long-term debt. The Master Lease is distinguishable from a long-term financial obligation for a capital expenditure because of its non-appropriation clause. The Master Lease's non-appropriation clause, which allows CTC to return the leased equipment and terminate the lease without penalty if its governing body, the JOC, fails to appropriate sufficient funds in any fiscal year for rent payment.

The Master Lease is structured as a series of renewable, one-year obligations

---

**5.** "[A]ppropriation" is the "exercise of control over property; a taking of possession." Black's Law Dictionary 117–18 (9th ed.2009). "Non" means "not; no. ● This term negates...." *Id.* at 1149.

Thus, a non-appropriation clause is a clause that negates the exercise of control over property or negates the taking of possession. Therefore, a lease-purchase agreement with a nonappropriation clause is a lease to own

agreement with an option of opting out of the agreement, in this case, each fiscal year.

**6.** *See also Fults v. City of Coralville,* 666 N.W.2d 548, 556–59 (Iowa 2003); *Wilson v. Kentucky Transportation Cabinet,* 884 S.W.2d 641, 645 (Ky.1994); *State ex rel. Kane v. Goldschmidt,* 308 Or. 573, 783 P.2d 988, 996 & n. 12 (1989) (each suggesting that, if not "debt," such funds must be considered an "expense").

subject to CTC's ability to appropriate funds for the lease payments. If sufficient funds are not appropriated for payment, the Master Lease is terminated and the equipment is returned to the lessor. If a lessee can non-appropriate without penalty, then the debt is not a long-term debt but an operating expense.[7]

The Master Lease is an agreement that, by its own terms, does not constitute a debt because it can be canceled without penalty or expense by electing not to appropriate funds for rental payments in any fiscal year. The Master Lease is not an outstanding obligation for a capital expenditure within the meaning of Article 11 of the Agreement.[8] Because there were no outstanding financial obligations for capital expenditures on the date the declaratory judgment action was filed, Riverside may end its participation in CTC.[9]

Accordingly, we reverse that portion of the trial court's June 21, 2013, order that denied Riverside's request for declaratory judgment and found that Riverside breached its contract with CTC, and affirm that portion of the trial court's order that denied CTC's request for declaratory relief seeking to prohibit Riverside from allowing its students to attend an out-of-area vo-tech school.

## ORDER

AND NOW, this *5th* day of *November,* 2014, we hereby reverse that portion of the June 21, 2013, order of the Court of Common Pleas of Lackawanna County that denied Riverside School District's request for declaratory relief and rendered a verdict in favor of the Career Technology Center of Lackawanna County for breach of contract, and affirm that portion of the trial court's order that denied the Career Technology Center of Lackawanna County's request for declaratory relief seeking to prohibit Riverside School District from allowing its students to attend an out-of-area vo-tech school.

7. The trial court misconstrued sections 19 (Events of Default) and 20 (Remedies) of the Master Lease, as these sections are subject to section 6 (Termination Upon Non–Appropriation Event) of the Master Lease. If CTC elects not to appropriate funds and continues to make lease payments, the "Events of Default" and "Remedies" provisions never come into play. If CTC fails to appropriate sufficient funds to renew the lease, there is no acceleration of rent payments through the end of the lease term. The acceleration of rent payments is limited to payments due during the current fiscal year for which appropriation has been made.

8. We note that Article 11 of the Agreement provides for the Agreement to remain in effect until "all obligations for financing the construction, remodeling or alteration of the [vo-tech] schools, and all obligations created in connection therewith or in the financing of any subsequent capital expenditures shall have been paid in full." Article 11 refers to "capital expenditures" as "construction, remodeling or alteration" of the school. The lease for a cutter and a printing press would be more similar to the lease of a copy machine or a computer than to "construction, remodeling or alteration" of the school. Thus, it would be beyond the terms of the Agreement to include the Master Lease as a capital expenditure as defined in Article 11 of the Agreement.

9. Due to our determination that there were no outstanding financial obligations, we need not address Riverside's argument that the Agreement, as construed by the trial court, is for a perpetual term.